IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gail Stierwalt,                                         3:06CV1656

        Plaintiff,

      v.                                             ORDER

CSX Transportation, Inc.,

        Defendant.


       This is a case arising under three statutes providing for recovery for injured railway workers: the Safety Appliance Act [SAA], 49 U.S.C. § 20301 *et seq.*, the Boiler Inspection Act (recodified in 1994 as the Locomotive Inspection Act [LIA], 49 U.S.C. § 20701 *et seq.*), and the Federal Employers' Liability Act [FELA], 45 U.S.C. § 51 *et seq.* Plaintiff brings the lawsuit against CSX Transportation [CSXT] for the permanently disabling injuries she claims to have sustained while working for defendant.

       According to the plaintiff, CSXT violated the SAA by not providing a safe walkway and appropriate ballast; the LIA by not complying with three federal regulations promulgated there under [49 C.F.R. § 229.45, 49 C.F.R. § 229.7 and 49 C.F.R. § 229.9]; and the FELA by creating unsafe working conditions, thereby causing her injuries.[1]

       Pending are cross-motions for summary judgment. [Docs.16, 23].

---

[1]Plaintiff has voluntarily withdrawn her claims for alleged SAA violations and noncompliance with 49 C.F.R. § 229.9. [Doc. 22]. The only claims at issue are the two alleged violations of the LIA and the general FELA claim.

Defendant's motion for summary judgment shall be granted as to the plaintiff's claims under the SAA, her lead locomotive claim under the LIA, and her FELA claims. Defendant's motion for summary judgment shall be denied with regard to plaintiff's LIA claim as to the appurtenances of the third and fourth locomotives.

Plaintiff's motion for summary judgment shall be denied.

**Background**

On April 13, 2005, plaintiff was assigned by defendant to work as a conductor on a crew transporting train Q377 from Crestline, Ohio, to Indianapolis, Indiana. Train Q377 was a freight train that originated in Buffalo, New York, and was taken from Buffalo to Crestline by Johnnie Smith, a locomotive engineer for CSXT. The consist for train Q377 included a total of four locomotives and a forty-eight railcars.

In his deposition, Smith testified that he had completed a required calender day inspection of locomotive 8194, the lead locomotive of train Q377, with no defects noted. While en route to Crestline, the lead locomotive encountered a problem. Smith stated that it was not "loading"–it was not transmitting power to the traction motors. The crew advised the CSXT train dispatcher of the locomotive defect, and was instructed to continue westward and take the train another fifty miles to the re-crew location at Crestline. Smith kept the lead locomotive running at idle and took the train safely to the re-crew location.

Stierwalt and her locomotive engineer, Mike Franklin, were assigned to pick up train Q377 at Crestline and continue the westward journey to Indianapolis. When plaintiff and Franklin arrived, Franklin discovered that the lead locomotive on the train was not running. The Auxiliary Power Unit (APU) had automatically shut down the lead locomotive and Franklin was unable to restart it. After

discussions with the dispatcher, CSXT instructed Stierwalt and Franklin to proceed to Polelane Road at the Marion Equipment Depot to switch out the lead locomotive for the third locomotive in their four locomotive consist.

As conductor, plaintiff had ultimate authority to determine whether the train was safe to move. In fact, Stierwalt testified that despite the fact that she had to regularly press the auxiliary power button, she determined that it was safe to move the locomotive to be switched from the lead.[2]

The train proceeded to Marion. On arrival, Stierwalt dismounted the lead locomotive to assist with separating the third and fourth units to replace the lead unit. She was injured when, on being startled by a blast of air from a pressurized air hose, she fell backwards on the ballast.

Stierwalt testified on deposition that while standing in front of and preparing to close an angle cock on the fourth locomotive unit prior to uncoupling two air hoses between the third and fourth locomotives, the air hoses spontaneously separated. Plaintiff further testified that she did not touch the angle cocks on either the third or fourth locomotive units. She contends that she was visually inspecting the connections when the main reservoir hose connected to the locomotives separated.

CSXT claims that plaintiff solely caused the blast when she mistakenly opened a closed shut-off valve to a main reservoir line on the fourth locomotive unit. The line was not connected to the corresponding line from the third locomotive unit. By opening the shut off valve, plaintiff, according to the defendant, caused the sudden escape of air which startled the plaintiff and caused her to fall.

---

[2]According to Stierwalt, she had to regularly push an auxiliary power button in order to keep the electrical components (i.e., headlights, ditchlights and in-cab lighting) operating on the lead locomotive. Defendant disagrees and states that the move to Polelane Road was without problem and that the electrical components functioned properly.

Defendant also contends that the physical facts show incontrovertibly that the hoses were not connected.

After Stierwalt fell, Franklin dismounted from the third locomotive unit. According to his testimony, he shut off the main reservoir valve and assisted plaintiff to her feet. Stierwalt and Franklin then completed the switching move.

Jim Bondzeleske, CSXT's Road Foreman and Stierwalt's direct supervisor, responded to the scene of the incident. When Bondzeleske arrived, Stierwalt had already been taken to the hospital. Bondzeleske spoke with Franklin and obtained a handwritten statement from him that evening. According to Bondzeleske's affidavit, Franklin said that after Stierwalt fell, air was coming from the main reservoir line on the fourth locomotive.

Although Franklin stated that he closed the main reservoir valve on the fourth locomotive unit and then assisted Stierwalt, he has provided an affidavit in which he asserts that he observed air escaping from the main reservoir hoses on both the units and closed the valves to the main reservoir on both the units. This version of what he saw and did corroborates plaintiff's claim that the hoses had been connected and ruptured spontaneously.

Bondzeleske spoke with Train Master Brad Kesler, who went to the hospital to check on Stierwalt. Kesler informed Bondzeleske that Stierwalt indicated to him that she was turning an angle cock when the rush of air occurred. In addition, Bondzeleske spoke with two CSXT mechanical employees. In completing a full mechanical inspection of the hoses, valves, clutches and gaskets related to the main reservoir line of both of the third and fourth locomotive units, they concluded that there were no defects in these items.

4

Bondzeleske composed a written report of his findings. Based upon his entire investigation of the incident, Bondzeleske came to the conclusion that Stierwalt mistakenly opened a closed shut-off valve for the main reservoir line on the fourth locomotive, allowing pressurized air to release into the atmosphere through the main reservoir hose which was not connected to the third locomotive. This caused the hose and metal glad hand to flail about, startling Stierwalt and causing her to fall.

## Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citing Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Maytsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, *supra*, 477 U.S. at 324. Summary judgment shall be rendered if the pleadings, depositions,

5

answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## Discussion

### 1. LIA Violation

The LIA imposes strict liability on railroad carriers for violations of its safety standards. *See Urie v. Thompson*, 337 U.S. 163, 188-190 (1949). Section 20701 of the LIA provides:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad only when the locomotive or tender and its parts and appurtenances
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and,
> (3) can withstand every test prescribed by the Secretary of Transportation under this chapter.

49 U.S.C. § 20701 (2000).

There are three distinct requirements for the LIA to apply: 1) plaintiff must show the locomotive was "in use" at the time of the injury; 2) the locomotive must be "on [defendant's] railroad" at the time of the injury; and 3) plaintiff must prove that the condition of the locomotive created an unnecessary danger of personal injury. Plaintiff may not assume three requirements are met, they must be proven before the LIA mandates and regulations promulgated thereunder can be applied to the facts surrounding an employee's injury. At issue in the instant matter are the first and third of these requirements.

### a. "In Use"

Absolute liability under the LIA does not attach unless the locomotive in question was "in use" at the time of the employee's alleged injuries. *McGrath v. Consolidated Rail Corp.*, 136 F.3d

6

838, 842 (1st Cir. 1998) (Boiler Inspection Act [BIA]).[3] Determination of whether locomotive was "in use" is critical; if the locomotive was not "in use" the LIA claim cannot go forward. Whether a locomotive is "in use" is a question of law for the trial court to decide. *Pinkham v. Maine Cent. R.R. Co.*, 874 F.2d 875, 881 (1st Cir. 1989).

The purpose of the "in use" limitation is to give railroads the opportunity to inspect for and correct defective conditions before being exposed to strict liability. *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 288 (4th Cir. 1999); *Angell v. Chesapeake and Ohio Railway Co.*, 618 F.2d 260, 262 (4th Cir. 1980). The general rule is that once a locomotive has been taken to be serviced in a place that is designated only for repair, it is no longer "in use." *Steer v. Burlington Northern, Inc.*, 720 F.2d 975 (8th Cir. 1983). Thus, "[c]ongressional intent and the case law construing the statute clearly exclude those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility." *Angell*, *supra*, 618 F.2d at 262. The final determination of whether a train is "in use" requires consideration of the circumstances of each case.

Determining whether a locomotive is "in use" is not always a "fairly straightforward exercise." *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 329 (4th Cir. 1998). To be sure, a

---

[3]

The "in use" requirement of the former BIA was substantially similar to that set forth in the LIA. *See* 45 U.S.C. § 23. I also recognize that the SAA contains functionally equivalent "in use" language. *See Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 288 n.2 (4th Cir. 1999) (applying case law interpreting the BIA to an SAA claim because the two statutes contain identical "in use" language).  This opinion will therefore refer to decisions discussing the "in use" requirement under the BIA and the SAA.

In *Hinkle v. Norfolk Southern Ry. Co.*, 2006 WL 3783521 (2006), Judge Frost of the Southern District of Ohio noted that the Sixth Circuit has not addressed what the correct "in use" analysis is. Recognizing that there is no controlling "in use" decision, I am guided by sister courts' approaches to determine whether the locomotive in this case is "in use."

locomotive pulling a train on a main line is "in use," and a locomotive in a repair shop for servicing is not "in use." *See McGrath*, *supra*, 136 F.3d at 842; *Phillips*, *supra*, 190 F.3d at 288.

Analytical problems arise, however, when a locomotive is in transition from one status to another. There is no bright line separating "use" from "non-use," and it is possible for a locomotive to be "in use" even though it is motionless and not on a main track. *Brady v. Terminal R. Ass'n*, 303 U.S. 10, 13 (1938) (holding that a train that had been placed on a temporary receiving track for purpose of inspection pending the continuance of its journey was "in use" within the SAA); *McGrath*, *supra*, 136 F.3d at 842.

Not having found a case involving a locomotive that has broken down while underway and been moved to a point at which it was to be set out for repair, I conclude that the locomotive in this case was "in use" under the LIA. It had been released for, and had been in service until the breakdown.  *Cf. Trinidad v. Southern Pac. Transp. Co.*, 949 F.2d 187, 189 (5th Cir. 1991) (where locomotive has not completed inspection, it is not "in use"). Though not itself running, it remained coupled to a train that was headed for its final destination, and would continue toward that destination once the inoperable locomotive was set out.

The LIA is a safety measure and the ultimate goal is to protect railroad workers from injury and death. *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir.2001). Remedial statutes are to be construed liberally to fulfill their purposes, *see Lilly v. Grand Trunk Western R.R. Co.*, 317 U.S. 481, 486 (1943), and this can best be accomplished by finding that the locomotive in this case was in use at the time of plaintiff's accident. Accordingly, I find that the LIA is applicable to the instant case.

The third and fourth locomotives were, in any event, clearly in use.

8

### b. Unnecessary Danger of Personal Injury

Notwithstanding my finding that the lead locomotive was in use, the statute requires that the locomotive's "parts and appurtenances" be both "in [a] proper condition and safe to operate without unnecessary danger of personal injury." This prerequisite to the applicability of the LIA has been placed in the General Provisions of 49 C.F.R. § 229, Railroad Locomotive Safety Standards promulgated by the Secretary of Transportation under authority of the statute. This particular regulation states in pertinent part:

> The Locomotive Inspection Act [49 U.S.C. § 20701 *et seq.*] makes it unlawful for any carrier to use or permit to be used on its line any locomotive unless the entire locomotive and its appurtenances -
> (1) Are in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb; and
> (2) Have been inspected and tested as required by this part.

49 C.F.R. § 229.7(a).

Plaintiff cites an another General Provision, 49 C.F.R. § 229.45, in support of her arguments. This general regulation provides that a locomotive must not only have an improperly functioning component, but that its condition must result in unnecessary risk of crew safety. The regulation provides in whole:

> All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train. These conditions include: insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam, and other leaks and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

49 C.F.R. § 229.45.

9

The Supreme Court has held that there is such a division between these two requirements. *See Lilly*, *supra*, 317 U.S. at 485-87. I am instructed by the Court's holding; therefore, without both parts of the requirement there can be no violation of the LIA.

There are two distinct issues within the unnecessary danger of personal injury consideration: namely, the condition of the 1) lead locomotive and 2) hoses between the third and fourth locomotive units.

### i. Lead Locomotive

The dual requirements of the LIA do not prohibit a locomotive from having non-functioning components that may impose some danger on employees. Rather the LIA imposes a violation when the non-functioning component presents an unnecessary peril to life or limb. *See United States v. Baltimore & O.R. Co.*, 293 U.S. 454, 462 (1935) ("[t]he operation of an engine, however, equipped, involves some 'danger to life or limb.'"). With regard to the lead locomotive, I agree with plaintiff that it was not in proper condition, but I disagree that it could not be moved without unnecessary danger of personal injury. Plaintiff's own determination on April 13, 2005, while acting as the person with ultimate authority to make such a determination, that the lead locomotive was safe to operate, cannot now be ignored.

The Federal Railroad Administration (FRA), recognized that locomotives may encounter problems at inconvenient locations, and 49 C.F.R. § 229.9 permits such locomotives to be moved to a more convenient location for repair. The FRA's analysis of the regulation prior to its enactment recognized these concerns and justified the exception by stating "[s]topping a train on a main line can present safety problems. Moreover, the possibility of stopping numerous trains at remote

locations because of the power penalty could also cause serious operational problems and delays." 45 Fed. Reg. 21,094 (Mar. 31, 1980).

At the time of the incident the subject locomotive was being moved in accordance with the specific regulatory exception to the statute that permits the movement of a non-compliant locomotive. *See* 49 C.F.R. § 229.9. Plaintiff has implicitly admitted that CSXT complied with this regulation by voluntarily dismissing her claim for relief specifically under 49 C.F.R. § 229.9. Further, the locomotive was moved without incident. Plaintiff simply has not shown any basis for concluding that the locomotive could not have been moved without unnecessary risk to her safety.

Plaintiff argues that a recent Sixth Circuit decision, *Richard v. Conrail*, 330 F.3d 428 (6th Cir. 2003), entitles her LIA lead locomotive claim to go to the jury. In *Richards*:

> the train unexpectedly stopped as a result of an automatic emergency application of the air braking system. In such a situation, the conductor must attempt to determine the cause of the undesired brake application. This is done by "walking the train"-i.e. getting off the train, walking its length, and inspecting for visible causes.  .  .  . [T]he stop must have been caused by a defective control valve, commonly referred to as a "kicker." Each freight car equipped with a brake has an internal valve that controls the amount of air that is depleted to activate the brake system.

330 F.3d at 431.

In that case, the defect which necessitated the crew member's dismount from the locomotive, and led to his injury, was not located on the locomotive. The causal connection between the defective brake and Richard's injury was that the application of the air braking system made it necessary for him to go find the defective brake and thus be where he was when he fell.

I recognize that the defective condition of the lead locomotive ultimately caused plaintiff to be where she was when she was injured: to respond to the problem created by the lead locomotive, Stierwalt had to uncouple the third and fourth units.

11

The defect causing her to be there – the breakdown of the lead locomotive – was not, as it was in *Richards*, what caused her injury. In that case, the train stopped because of a malfunction on a car, which the employee had to find. He was injured while trying to find the defect.

Here the defect causing the train to stop was somewhere in the lead locomotive. That defect did not cause an unnecessary risk of injury: another defect in another locomotive created that risk. Accordingly, CSXT did not violate the LIA in connection with the use of the lead locomotive on April 13, 2005, because such use did not create an unnecessary risk of peril to life or limb.

### ii. Hoses Between the Third and Fourth Locomotive Units

Plaintiff has, however, shown that a genuine issue of material fact exists as to whether the hoses were or were not connected. Stierwalt claims that the hoses spontaneously separated; CSXT claims that they were disconnected and plaintiff mistakenly opened a valve that released air to one of the hoses, which, in turn, startled her and caused her fall.

Plaintiff points out that the principal affidavit on which defendant relies, that of Bondzeleske, the Road Foreman who inspected the units after plaintiff was injured, is not based sufficiently on his own observation. Rather it is primarily based on what he was told by others. Thus, a fundamental fact – whether the hoses were connected or not connected when the accident occurred – is a genuine issue of material fact to be decided by the jury.

Thus, an appurtenance of the third and/or fourth locomotives – the hoses connecting them – could be found by a jury not to have been "in proper condition and safe to operate without unnecessary danger of personal injury" under the LIA.

Therefore, defendant's motion for summary judgment cannot be granted as to this claim.

### 2. FELA Claims

12

To establish a *prima facie* case under the FELA, the plaintiff must show: 1) she was injured while in the scope of his employment, 2) which employment is in furtherance of the railroad's interstate transportation business, 3) the railroad was negligent, and 4) the railroad's negligence in some way caused the injury for which damages are sought. *Green v. River Terminal Railway Co.*, 763 F.2d 805, 808 (6th Cir. 1985).

Under the FELA, defendant had a duty to "furnish its employees with a reasonably safe place to work, but the rule does not contemplate absolute elimination of all dangers, but only the elimination of those dangers which could be removed by reasonable care on the part of the employer." *Padgett v. Southern Ry.*, 396 F.2d 303, 306 (6th Cir. 1968) (internal citation omitted). In order to prevail, plaintiff must demonstrate that defendant had actual or constructive notice of the defect prior to the accident or plaintiff must show that such an injury was reasonably foreseeable to defendant. *See, e.g.*, *Baynum v. Chesapeake & Ohio Ry. Co.*, 456 F.2d 658, 660 (6th Cir. 1972); *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (1990). What is reasonably foreseeable depends, as it does in any negligence claim, on what is reasonably foreseeable in the circumstances. *Green*, *supra*, 763 F.2d at 809.

In this case, though the CSXT knew that the lead locomotive was not in good working order, the jury could not find a causal connection between any such defect and the plaintiff's injury. That she would be injured after dismounting the locomotive was not something that CSXT could reasonably foresee, given the lack of reason to believe that some defect on another locomotive might cause injury.

13

With regard to the alleged defect of the hoses between the third and fourth locomotives, plaintiff has not alleged that CSXT was on notice of any such defect. Absent notice of the condition, CSXT cannot be held liable for any resulting injury.

Defendant is entitled to summary judgment as to plaintiff's FELA claims.

### 3. Plaintiff's Motion for Summary Judgment

The same genuine dispute of material fact that precludes defendant's motion for summary judgment as to the claim under the LIA for a defect in the hose connections between the third and fourth locomotives likewise requires that plaintiff's motion for summary judgment be overruled.

### Conclusion

Plaintiff has shown a genuine issue of fact as to what caused the hoses to separate. A jury could find that the separation was spontaneous. In which case, she could prevail on her claim that the appurtenances of the third and fourth locomotives did not comply with the LIA.

Plaintiff cannot prevail on her other claims. It is, therefore,

ORDERED THAT

1. Defendant's motion for summary judgment be, and the same is hereby granted as to plaintiff's claims under the SAA, her lead locomotive claim under the LIA, and her FELA claims;

2. Defendant's motion for summary judgment be, and the same hereby is denied as to plaintiff's LIA claim as to the appurtenances of the third and fourth locomotives; and

3. Plaintiff's motion for summary judgment be and the same hereby is denied.

So ordered.

s/James G. Carr
James G. Carr

14

Chief Judge